Shalley v. Fleet Credit Card
**STATEMENT OF UNDISPUTED FACTS**

    **A. The Parties**

    1.     Plaintiff Perry Shalley is 43 years old and had been employed by various employers over the years working in the banking and credit financing industry. (See Plaintiff's Complaint, Exhibit "1"; Plaintiff's December 26, 2002 Deposition, p. 225, attached hereto as Exhibit "3").

    2.     Defendants Fleet Credit Card Services, LC and Fleet Credit Card, LLC, [hereinafter "Fleet"] maintained an office located in Horsham, PA and were engaged in the business of credit card services and financing. (See Defendants' Answer, Exhibit "2").

    **B. Plaintiff's Employment With Fleet**

    3.     In October of 1997, Mr. Shalley began employment with Advanta, as a Decision Support Analyst II – a grade level 17 position within Advanta's organizational structure. He was paid a base salary of $61,000 and received a signing bonus. (See Plaintiff's Dep., Ex. 3, pp. 12, 68-71).

    4.     In mid-1998, Fleet acquired Advanta and effectively became plaintiff's employer. Mr. Shalley remained employed as a Decision Support Analyst at the same grade level within Fleet's Customer Development Relationship Management division ("CDRM"). (See Plaintiff's Dep., Ex. 3, pp. 71, 82).

    5.     A major aspect of plaintiff's responsibilities as an analyst within CDRM involved the database "Smartmove", which analyzed data of prospective and existing customers who transfer balances from other creditors to Fleet when opening a new account. Plaintiff spent approximately 80% of his time working on Smartmove analysis and related matters. (Plaintiff's Dep., Ex. 3, pp. 72, 100-04).

6. In May of 1999, Mr. Shalley was promoted by Fleet to Director of Analysis -- a grade level 20 position with a salary of $76,000 and a target bonus of 20%. In accepting this position, plaintiff moved out of Fleet's CDRM division and transferred to Fleet's New Product Development or Customer Information division. (Plaintiff's Dep., Ex. 3, pp. 85, 92, 94).

7. In his capacity as Director of Analysis, plaintiff reported to John Witterschein and continued to be responsible for data analysis, and also oversaw outside consultants and provided input for new product development. (Plaintiff's Dep., Ex. 3, pp. 110-112).

8. In October of 1999, John Witterschein resigned from Fleet and plaintiff subsequently began reporting to Jeff Healy within Fleet's Customer Information division. (Plaintiff's Dep., Ex. 3, pp. 115, 118).

**C. Problems With Plaintiff's Performance Begin**

9. Mr. Healy was dissatisfied with plaintiff's performance within months of supervising plaintiff. On January 20, 2000, Mr. Healy met with plaintiff to discuss specific problems, including plaintiff's mistakes made in performing a home equity analysis project, repeated failures to provide weekly updates in standard format, plaintiff's failure to properly review an Attrition Tracking report he had prepared and consequent failure to detect mistakes made, thereby causing problems within Fleet's marketing department. (See Affidavit of Jeff Healy, attached hereto as Exhibit "4"; Plaintiff's Dep., Ex. 3, pp. 142, 145).

10. Mr. Healy also counseled plaintiff on January 20, 2000 about his tardiness in reporting to work and the need to arrive at work at a consistent hour. He advised plaintiff that he was to be accountable for projects and was expected to perform at a higher level. Mr. Healy reminded plaintiff that formal evaluations would be prepared in March. (See Affidavit of Jeff Healy, Ex. 4; Plaintiff's Dep., Ex. 3, pp. 142, 145).

11. In March of 2000, Jeff Healy prepared a formal evaluation of plaintiff's performance and recommended a 0% increase in pay.  The evaluation indicates that plaintiff has acknowledged performance problems and his lack of motivation. (See Affidavit of Jeff Healy, attached as Ex. 4; March 2000 Fleet Performance Appraisal, attached as Exhibit "5").

### D. Plaintiff's FMLA Leave and Fleet's Reorganization

12. On February 14, 2000, plaintiff injured his back at home as a result of twisting while getting up from a seated position.  He advised Fleet that he would be unable to work and was consequently placed on leave under the Family and Medical Leave Act from February 21, 2000 through May 12, 2000.  (Plaintiff's Dep., Ex. 3, pp. 36-38, 59-60).

13. At some point in January of 2000 -- prior to his injury -- plaintiff became aware of a pending major reorganizational change at Fleet whereby its New Product Development /Customer Information division would be merged with Fleet's CDRM division. (Plaintiff's Dep., Ex. 3, pp. 120-21).

14. On March 8, 2000, Jeff Healy called plaintiff at home and explained the implementation of this major reorganizational change and that plaintiff was to be reassigned to Jack Nui's team within Fleet's CDRM division and would now report to Anthony Beavers.  A major reason for plaintiff's reassignment was the fact that the Smartmove work was now under Jack Nui's authority, and given plaintiff's past experience with Smartmove, he would also be reassigned.  (Plaintiff's Dep., Ex. 3, pp. 158-59, 161-62; Jeff Healy Affidavit, Ex. 4).

15. Significantly, plaintiff was not the only person reassigned due to the reorganization.  Numerous other Fleet employees were effected by the reorganization, including John Carter, who like plaintiff, was also reassigned from Jeff Healy's team to Jack Nui's team.

(See Plaintiff's Dep., Ex. 3, pp. 153, 159, 160, 164-66; Jeff Healy Affidavit, Ex. 4; Fleet Organizational Charts, attached hereto as Exhibit "6").

16. As a result of this reassignment to Jack Nui's team, plaintiff's pay, benefits, and grade level remained the same. (Plaintiff's Dep., Ex. 3, pp. 161-62, 164).

### E. Plaintiff's Performance Problems Continue

17. On May 12, 2000, plaintiff returned from his FMLA leave to work at Fleet under the direct supervision of Anthony Beavers. Like Mr. Healy, Mr. Beavers developed concerns over plaintiff's job performance and subsequently gave plaintiff three negative performance evaluations. (Plaintiff's Dep., Ex. 3, pp. 166, 169-70).

18. On May 23, 2000 and June 30, 2000, plaintiff received Formal Counsel or Reprimands from Mr. Beavers due to plaintiff's substandard performance. These reprimands dealt with plaintiff's inability to develop any tracking for certain variable rate accounts, his failure to meet deadlines, and his lack of technical understanding of certain software programs. Plaintiff was also reprimanded for repeated tardiness, his failure report to work before 10:00 am, and his failure to notify his employer when absent from work. (See June 30, 2000 Fleet Formal Counsel, attached hereto as Exhibit "7").

19. Plaintiff was advised that a follow-up review would be scheduled for July 19, 2000 to evaluate his progress. He signed Fleet's Formal Counsel form, acknowledging his understanding that the failure to show immediate and sustained improvement would necessitate further action, including termination of his employment. (Id.).

20. On July 21, 2000, plaintiff received another Formal Counsel/Reprimand from Mr. Beavers based upon his continued inability to complete the Smartmove analysis and continued failure to meet deadlines. This reprimand also noted the errors in the analyses plaintiff did

produce and plaintiff's continued failure to report to work as of 8:30 am. (See July 21, 2000 Fleet Formal Reprimand, attached hereto as Exhibit "8").

21.  Effective July 24, 2000, plaintiff was reassigned within CDRM to work for the Risk Management/Operations Department under the direct supervision of Larry Farrell and the overall supervision of Diane Arthur.  He was advised that his July 21, 2000 Reprimand served as final warning that any type of attendance issue, such as tardiness, unexcused absence or failure to meet expectations of his work assignments or any violation of the prior written warnings would be grounds for termination. (Id).

22.  Once reassigned to work for Mr. Farrell and Ms. Arthur, plaintiff's salary and grade level remained unchanged. (Plaintiff's Dep., Ex. 3, p. 191).

23.  On July 24, 2000, plaintiff met with Larry Farrell and Diane Arthur to review his new assignments and was advised that these assignments must be complete, accurate and in compliance with deadlines.  Plaintiff was further advised that he was expected to report to work at 8:30 am each day and any failure to do so would be grounds for termination. (See July 27, 2000 Memo to File, attached hereto as Exhibit "9"; Plaintiff's Dep., Ex. 3, p. 203-05).

24.  Like Mr. Healy and Mr. Beavers, Larry Farrell became dissatisfied with plaintiff's performance.  On July 27, 2000, he met with plaintiff to review the status of his assignments and due to plaintiff's failure to follow directives, the projects were behind schedule.  Plaintiff was advised by Mr. Farrell that the projects had to be completed by 10:00 am on July 28, 2000 and that plaintiff was to be prepared to meet with him at that time.  (See July 27, 2000 Interoffice Memorandum, attached hereto as Exhibit "10").

25. On July 27, 2000, plaintiff took a three hour lunch despite being behind schedule on his work assignments and despite the impending July 28, 2000 deadline. (Plaintiff's Dep., Ex. 3, p. 206).

26. On July 28, 2000, plaintiff failed to report to work and also failed to meet Mr. Farrell's July 28th deadline. Further, the work that plaintiff had completed thus far on those assignments was replete with error. (See July 31, 2000 Interoffice Memorandum, attached hereto as Exhibit "11"; Plaintiff's Dep., Ex.3, p. 207).

27. On July 31, 2000, Fleet terminated plaintiff's employment for tardiness and his failure to meet job expectations. (Plaintiff's Dep., Ex. 3, pp. 208-210).